

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

ENTERED
01/05/2011

| | | |
|---|---|---|
| IN RE: | § | |
| **ANITA C RAMIREZ,** | § | **Case No. 09-70051** |
| Debtor(s). | § | |
| | § | **Chapter 7** |
| | § | |
| **JOSE ALBERTO RODRIGUEZ,** *et al,* | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **Adversary No. 09-7004** |
| | § | |
| **ANITA RAMIREZ,** *et al,* | § | |
| Defendant(s). | § | **Judge Isgur** |

## <u>MEMORANDUM OPINION</u>

In October 2005, Leonardo Ramirez, Sr. shot Roberto Rodriguez.  Roberto Rodriguez was paralyzed, and Leonardo Ramirez was convicted in state court for the shooting.  In February 2006, Rodriguez and his wife, Patricia, and their two children, Jose and Maria, sued Leonardo and Anita Ramirez in state court.  On April 3, 2008, the state court awarded the Rodriguezes over $19.7 million.

On March 20, 2008, the Rodriguezes sued Leonardo Ramirez, Sr., his wife Anita Ramirez (collectively, "Ramirezes"), and his children Leonardo Ramirez, Jr., Anita Garza, and Feliberto Ramirez , their spouses Billie Jo Ramirez and Alicia Ramirez, and Feliberto and Alicia Ramirez's son, Feliberto Ramirez, Jr., for fraudulent transfers.  The Ramirezes filed for bankruptcy, and their chapter 7 Trustee, Michael Schmidt ("Trustee"), became the sole party plaintiff in the fraudulent transfer claims.  Leonardo Jr. and Billie Jo Ramirez settled with the Trustee before trial.  The Court finds that the Ramirezes, Anita Garza, and Feliberto Ramirez conspired to and did transfer real estate and money with the intent to hinder, delay, and defraud

the Ramirezes' creditors.  The defendants, with the exception of Alicia Ramirez and Feliberto

Ramirez, Jr., are jointly and severally liable for exemplary damages and for legal fees.

The total judgment is $2,551,640.43.  Of this amount, Leonardo and Anita Ramirez are

jointly and severally liable for $2,101,137.93, which includes exemplary damages and legal fees.

Anita Garza is jointly and severally liable for $2,551,640.43, the entire amount of actual

damages, exemplary damages, and legal fees.  Feliberto Ramirez is jointly and severally liable

for $1,451,640.43, which includes actual damages, mitigated exemplary damages, and legal fees.

By settlement, Leonardo Ramirez, Jr. is liable for $150,000.00.  Additionally, title to certain

fraudulently transferred real estate is vested in the Trustee.

### BACKGROUND

After the shooting, Leonardo Ramirez, Sr., Anita Ramirez, Anita Garza, and Feliberto

Ramirez conspired to prevent Roberto Rodriguez from collecting on any judgment he and his

family might obtain.  Leonardo had intended to kill Roberto, and Roberto was left a quadriplegic.

Before the shooting, Roberto had worked for the Ramirezes as a tractor driver.  Roberto was

unable to work after the shooting.  The Ramirezes were aware when they began to transfer their

assets that Roberto and his family were likely to be awarded a judgment because of the injuries.

While Leonardo was released on bond awaiting his criminal trial, he and Anita

transferred the title to six tracts of real property, consisting of approximately 121 acres, to their

children.  Five of the tracts were transferred through one deed (the first Gift Warranty Deed), and

one other tract was transferred through another deed (the second Gift Warranty Deed).  All of the

real estate ("Ramirez Property") was transferred on November 11, 2005.

Leonardo and Anita Ramirez also began to sell items of personal property, including livestock and farm equipment.  Testimony indicated that the Ramirezes sold the livestock and farm equipment at fair market value.

In February and March of 2006, the Ramirezes transferred $450,502.50 in cash to their children.  The Ramirezes transferred the money in their accounts at the La Joya Area Federal Credit Union and Texas State Bank to Feliberto and Leonardo Jr.[1]

After these transfers, the Rodriguezes' suit against the Ramirezes went to trial.  The Hidalgo County District Court heard the case on March 19, 2008.  On April 3, 2008, the court entered a final judgment awarding the Rodriguezes $19.7 million in damages.  To Roberto Rodriguez, the court awarded $8.5 million in actual damages and $6 million in exemplary damages.  Patricia Rodriguez was awarded $2 million in actual damages and $1.5 million in exemplary damages.  Jose and Maria Rodriguez were each awarded $500,000.00 in actual damages and $350,000.00 in exemplary damages.  The court also awarded pre-judgment interest on the actual damages.

On March 20, 2008, the Rodriguezes filed this lawsuit against the Ramirezes in the Hidalgo County District Court, asserting claims under the Texas Uniform Fraudulent Transfer Act (TUFTA).  The Ramirezes filed for bankruptcy on January 16, 2009, and they removed this action to the Bankruptcy Court on February 13, 2009.  Chapter 7 Trustee Michael Schmidt moved to intervene on February 24, 2009, and the Court granted his motion on March 16, 2009.  The Court named Schmidt the sole plaintiff with respect to the TUFTA claims.  The Rodriguezes

---

[1] After declaring bankruptcy in 2009, Anita Ramirez lied about the transferred funds, asserting at her 341 Meeting that she had not had significant amounts of money in these accounts.  When confronted with tax returns indicating that she had received interest from the accounts, she could not adequately explain where the interest had come from or why the income was designated as interest.

remained plaintiffs with respect to various tort claims, but those claims were resolved by summary judgment on July 28, 2010.  (Doc. No. 218.)

Before the case was removed, Anita Ramirez had been ordered to produce certain documents requested by the Rodriguezes.  Anita Ramirez failed to produce the documents either before or after removal, and the Court imposed sanctions on her on May 11, 2010.

Prior to the trial, Schmidt settled with Billie Jo Ramirez, Gulf Coast Federal Credit Union, and Leonardo Ramirez, Jr.  Schmidt's settlement agreement with Billie Jo Ramirez stipulated that, in exchange for $200,000.00, Billie Jo would be able to keep all items partitioned in her favor in a partition agreement with her husband, Leonardo Ramirez, Jr.  Billie Jo Ramirez and Gulf Coast Federal Credit Union were dismissed from this proceeding on July 28, 2010.

Leonardo Ramirez, Jr. also settled with the Trustee before trial, and the order approving the settlement agreement was entered on November 4, 2010, at Doc. No. 182 in the main bankruptcy case, No. 09-70051.  Leonardo Jr.'s settlement provided that a judgment for $150,000.00 would be granted in the Trustee's favor against Leonardo Jr.  The agreement also provided that Leonardo Jr. would execute a special warranty deed in favor of the Trustee vesting him with title to his one-third interest in the Ramirez Property.  Leonardo Jr. agreed that if the Court avoided the transfers of the Ramirez Property to the other defendants, the Trustee would then give Leonardo Jr. a 10-acre square around the Ramirez house.  In the event that the Court did not avoid the transfers to the other defendants, Leonardo Jr. would retain a one-third interest in a 5-acre square around the Ramirez residence.

The case was tried from October 26-28, 2010 in McAllen, Texas.  Roberto, Patricia, Jose, and Maria Rodriguez testified about the harm the Rodriguez family suffered because of the transfers.  Demetrio Duarte and Michael Schmidt testified regarding legal fees.  Elia Villarreal,

Oscar Ontiveros, Dina Garcia, Eric Ivan Garcia, Rodolfo Montero, Sergio Zalvala, and Nora Figueroa testified about the location of the Ramirez homestead and the services provided to the area. Connie Hensley and Gracie Flores testified regarding the designation of Anita Ramirez's bank accounts. Feliberto Ramirez testified about the use of the Ramirezes' land, the sale of personal property, and other relevant facts. The Court admitted recordings of the deposition of Anita Ramirez, Anita Ramirez's testimony at a hearing, Anita Garza's deposition, Alicia Ramirez's deposition, and Anita Ramirez's 341 meeting.

At the close of the plaintiff's case, the defendants orally moved for judgment on partial findings. The Court granted the motion in part and denied the motion in part. The Court granted judgment in favor of the defendants on the common-law fraud and conspiracy to commit common-law fraud claims. The Court also granted judgment in favor of Feliberto Jr. and Alicia on the aiding and abetting claim, and the Court ruled that Feliberto and Alicia's transfer of land to Feliberto Jr. was not fraudulent. The plaintiffs moved for judgment on partial findings at the close of the defendants' case, and the Court reserved decision. The parties were allowed to file post-trial briefs. The Trustee and the defendants filed briefs. (Doc. Nos. 257 & 258.)

ANALYSIS

## I. Elements of a Fraudulent Transfer Under TUFTA

Under the Texas Uniform Fraudulent Transfer Act (TUFTA),

> a transfer . . . is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made . . . if the debtor made the transfer . . . (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed

> or reasonably should have believed that the debtor would incur,
> debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code § 24.005(a).   A transfer may be either actually or constructively fraudulent under § 24.005(a).

Under Tex. Bus. & Com. Code § 24.006, a transfer is constructively fraudulent

> as to a creditor whose claim arose before the transfer was made or
> the obligation was incurred if the debtor made the transfer or
> incurred the obligation without receiving a reasonably equivalent
> value in exchange for the transfer or obligation and the debtor was
> insolvent at that time or the debtor became insolvent as a result of
> the transfer or obligation.

An actual fraudulent transfer occurs when a debtor intends to hinder, delay, or defraud a creditor.   To determine whether the debtor had actual intent to hinder, delay, or defraud a creditor, the Court considers the badges of fraud listed in § 24.005(b):

> (1) the transfer or obligation was to an insider; (2) the debtor
> retained possession or control of the property transferred after the
> transfer; (3) the transfer or obligation was concealed; (4) before the
> transfer was made or obligation was incurred, the debtor had been
> sued or threatened with suit; (5) the transfer was of substantially all
> the debtor's assets; (6) the debtor absconded; (7) the debtor
> removed or concealed assets; (8) the value of the consideration
> received by the debtor was [not] reasonably equivalent to the value
> of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the
> transfer was made or the obligation was incurred; (10) the transfer
> occurred shortly before or shortly after a substantial debt was
> incurred; and (11) the debtor transferred the essential assets of the
> business to a lienor who transferred the assets to an insider of the
> debtor.

Tex. Bus. & Com. Code § 24.005(b).   Under Tex. Bus. & Com. Code § 24.006(b)(A)(i), an insider includes "a relative of the debtor or of a general partner of the debtor."   All of the Ramirez's children and their spouses are insiders.

A constructive fraudulent transfer occurs when the debtor makes a transfer without receiving reasonably equivalent value and when the debtor is insolvent under § 24.003 or the debtor's financial condition satisfies either § 24.005(a)(2)(A) or § 24.005(a)(2)(B).   The Ramirezes were insolvent at the time of the transfers.   Under § 24.003(a), a debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."

At the time of the transfers, the Ramirezes had already incurred the debt.   The debt arose on October 22, 2005, when Leonardo Ramirez shot Roberto Rodriguez.   *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 335 (S.D.N.Y. 2010) (noting that in tort cases, the relationship of debtor and creditor arises the moment the cause of action accrues); *see Colonial Leasing Co. of New England, Inc. v. Logistics Cont'l Grp. Int'l*, 762 F.2d 454 (5th Cir. 1985) (holding in a fraudulent transfer action that an unliquidated claim, which did not mature to judgment until later, had already accrued at the time of a transfer).   The amount of the debt was $19.7 million, greater than the value of all the Ramirezes' assets.   The Ramirezes therefore were insolvent at the time of each of the transfers. The transfers were constructively fraudulent if they were not made in exchange for reasonably equivalent value.

Because the Trustee alleges multiple transfers, the Court considers (i) whether the badges of fraud were present with respect to each transfer, and (ii) whether each transfer was made for reasonably equivalent value.   Some of the transfers, the Court finds, constitute both actually and constructively fraudulent transfers.   Other transfers, however, were neither actually nor constructively fraudulent.

The remedies for a fraudulent transfer include avoidance of the transfer, attachment, injunction and other equitable remedies, and execution on the transferred asset.   Tex. Bus. &

Com. Code § 24.008.  If any of the Ramirezes' transfers are found to be voidable, the Trustee may recover judgment for the value of the assets transferred or the assets themselves.  *See* Tex. Bus. & Com. Code § 24.009(b).

## II. The Ramirez Property and the Texas Homestead Exemption

In November 2005, Anita and Leonardo Ramirez transferred six tracts of real estate to their children.  The six tracts consist of approximately 121 acres of land in Hidalgo County.  The transferred real estate is made up of two parcels.  One parcel consists of several contiguous tracts ("Ramirez Homestead"), which are described as Tracts III-V on the first Gift Warranty Deed (Pl's Ex. 3) and Tract VI on the second Gift Warranty Deed (Pl's Ex. 4).[2]  The Ramirez Homestead consists of approximately 40.32 acres.  The other parcel, comprised of Tracts I and II on the first Gift Warranty Deed, consists of 81.56 acres and is not contiguous with the other tracts ("Noncontiguous Property").[3]

### A.  Exempt Status of Ramirez Homestead

The defendants assert that the transferred real estate would have been exempt at the time that Anita transferred it, and therefore any transfer could not have been fraudulent as to any creditors.  Under TUFTA, if the property transferred is exempt, a defrauded creditor is not afforded any relief.[4]  *Goebel v. Brandley*, 174 S.W.3d 359, 364 (Tex. App.—Houston [14th

---

[2] Tract III consists of 13.09 acres in Share 172, Tract 165 of Los Ejidos de Reynosa Viejo Partition in Hidalgo County.  Tract VI consists of .23 acre out of Tract 165 in Los Ejidos de Reynosa Viejo Partition.  Tract V consists of approximately 2 acres, all of Tract 164 in Los Ejidos de Reynosa Viejo Partition.  Tract VI is Tract 168 of the Los Ejidos de Reynosa Viejo Partition.

[3] The Noncontiguous Tract is made up of Tract I and Tract II, conveyed in the first Gift Warranty Deed and located in McCook, Texas.  Tract I consists of approximately 70.32 acres of land lying in Lot 1 of G.O. Newman's Subdivision of the El Benadito Grant, Hidalgo County, Texas.  Tract II consists of approximately 11.24 acres of land in Share 16 of the San Jose Grant in Hidalgo County.

[4] The Court does not decide whether the transfer of potentially exempt property may be avoidable under § 548 of the Bankruptcy Code.  The Trustee has not asserted a § 548 claim.  Moreover, the land transfer, which occurred in

Dist.] 2005); *see* Tex. Bus. & Com. Code §§ 24.002(2) (excluding exempt property from the definition of "asset") and 24.002(12) (defining "transfer" as the disposing of or parting with an asset, as defined by § 24.002(2)).

Although the Ramirezes had not claimed the Ramirez Homestead as exempt prior to the transfer, the property would have been exemptible.  The definition of *asset* in the Texas Business and Commercial Code expressly excludes "property to the extent it is generally exempt under nonbankruptcy law."  Tex. Bus. & Com. Code § 24.002(2).  The phrase "to the extent it is generally exempt" suggests that the legislature intended to exclude property that usually would be allowed to be exempted under the Texas Property Code, rather than limiting the exclusion to property that has already been claimed as exempt.  The absence of any statutory requirement of declaring the exemption also supports this conclusion.

Anita Ramirez has lived continuously in a house on the Ramirez Homestead since the 1950s, and she intends to continue living on the property.  Had she not transferred the land to her children, she could have claimed at least part of the property as exempt.  The extent of the property that can be claimed as exempt depends on whether the homestead is characterized as rural or urban.

### B.  Rural or Urban Homestead

A homestead, under § 41.002(c) of the Texas Property Code, is characterized as urban if it is located within the limits of a municipality or its extraterritorial jurisdiction or a platted subdivision, is served by police protection and volunteer fire protection, and has at least three of five listed utilities (electric, natural gas, sewer, storm sewer, and water) provided by a municipality or under contract to a municipality.  *See Rush Truck Ctrs. Of Texas LP v. Bouchie*

---

November 2005, took place more than three years before the Ramirezes filed bankruptcy in January 2009.  The transfer therefore would not have been avoidable under § 548 regardless of whether the property was exempt.

*(In re Bouchie)*, 324 F.3d 780, 785 (5th Cir. 2003) ("The amended statute [§ 41.002(c)] is the exclusive vehicle for distinguishing between rural and urban homesteads.").

The burden of proof is on the claimant to show that property is exempt homestead. *Bradley v. Pac. Sw. Bank (In re Bradley)*, 960 F.2d 502, 507 (5th Cir. 1992); *Burk Royalty Co. v. Riley*, 475 S.W.2d 566, 568 (Tex. 1972); *Denmon v. Atlas Leasing, LLC*, 285 S.W.3d 591, 595 (Tex. App.—Dallas 2009).   A rural homestead may consist of up to 200 acres if claimed by a family, while an urban homestead may consist of no more than 10 acres.   Tex. Prop. Code. § 41.002(a)-(b).   If the claimant seeks to protect a full 200-acre rural homestead, the claimant must prove the rural character of the property.   *Grisham v. Mabank Bank*, 1999 WL 261849, at *2 (N.D. Tex. Apr. 26, 1999); *Lowry v. Henderson*, 244 S.W. 636, 638 (Tex. Civ. App.—Austin 1922).   The Ramirezes thus bear the burden of establishing each element of a rural homestead.[5]

### C.  Location of Ramirez Homestead

Abram is an unincorporated community located between the incorporated cities of Penitas and Mission.   Anita Ramirez's mailing address is in Mission, Texas, but she lives outside the incorporated limits of that city.   All the land in Abram is within the extraterritorial jurisdiction (ETJ) of either Penitas or Mission.   Much of the Ramirez Property is used for farming.

The Abram area receives its electricity from companies in contract with the city of Mission.   Abram's gas supply comes from Texas Gas Service, which has a franchise agreement with Mission.   Abram's water is supplied by a corporation, and the record is unclear as to

---

[5] The urban or rural character of the property is determined at the time the homestead designation is made.   Tex. Prop. Code § 41.002(c); *Bouchie*, 324 F.3d at 783.   Here, the homestead designation is hypothetical.   The Court therefore considers whether the homestead was rural at the time of the transfers.   However, no evidence indicated that police or fire services to the property or utilities had changed between the time of the transfer and the time of the trial.   Regardless of whether the hypothetical designation occurred at the time of the transfer or the time of the trial, the Ramirez Homestead was rural.

whether the water is provided pursuant to a contract with Mission, Penitas, or another municipality. All of Abram is served by the fire department of some municipality—either La Joya, Palmview, or Mission. The storm sewer in Abram is provided and maintained by the United States federal government.

Because all of the Ramirez Homestead was located within the ETJ of either Penitas or Mission, the Ramirezes could prove that the homestead was rural only by showing either the lack of police and fire protection or the lack of utilities. The area is served by fire protection, but testimony showed that the property is not within the area normally served by the Penitas Police. The area is served by the Hidalgo County Sheriff. The Ramirezes proved a lack of municipally provided or municipally contracted storm sewer or sewer. Abram is served by electric and gas services provided under contract to Mission. However, the evidence was inconclusive as to whether the water service is provided under contract to any municipality.

The Ramirezes failed to establish that the water service is not provided by a municipality or under contract to a municipality. They established, however, that the area is not served by police protection. Under § 41.002(c) of the Texas Property Code, a homestead is not urban unless it is served by *both* police and fire protection. Although a witness from the City of Penitas testified that the Penitas police might be dispatched to Abram to deal with an emergency, the evidence showed that the area was not regularly served by police and that no police department would be obligated to provide protection to Abram.

The Court also concludes that the protection of the Hidalgo County Sheriff does not constitute police service within the meaning of the statute.[6] Section 41.002(c)'s requirements for

---

[6] The Trustee's post-trial brief, Doc. No. 257, at 7, argues that the court in *PaineWebber Inc. v. Murray (In re Murray)* assumed that the Fannin County Sheriff constituted police protection under § 41.002(c). 260 B.R. 815, 820 (E.D. Tex. 2001). The court in *PaineWebber* held, on other grounds, that the debtor's homestead was rural and did

establishing an urban homestead emphasize the control of a municipality.  For example, a homestead is not urban unless it is located within a municipality or within the ETJ.  Additionally, the statute is clear that utilities must be provided by a municipality or under contract to a municipality.

It is unclear whether the adjectival phrase "provided by a municipality or under contract to a municipality" applies only to the utilities or if it applies also to police and fire protection. But the statute's purpose of distinguishing areas that are functionally part of a municipality—and thus urban—from those areas that are sufficiently removed from any municipality—and thus rural—weighs in favor of applying the phrase to police and fire protection in addition to utilities. The presence of municipal police would strongly indicate that an area is functionally part of a municipality, while the presence of sheriff protection would not.

The Court finds additional guidance from the use of the term *police* elsewhere in Texas statutes.  Throughout Texas statutes, the term *police* generally refers to a municipal employee. *See, e.g.*, Tex. Loc. Gov. Code § 142.0013 (regulating the hours of labor and vacation for members of fire and police departments in municipalities of various sizes, and stating that a "police officer shall be granted the same number of vacation days and holidays, or days in lieu of vacation days or holidays, granted to other municipal employees").  Police officers are distinguished from county sheriffs.  *See, e.g.*, Tex. Code Crim. Proc. art. 2.12 (enumerating the types of officers that fall under the definition of "peace officer" and separately listing "sheriffs," art. 2.12(1), and "marshals or police officers of an incorporated city, town, or village, and those

---

not explicitly consider the question of whether the sheriff constituted police protection.  The court did note that "such services as utilities and fire and police protection are provided to the site by Fannin County."  *Id.*  This statement is simply a factual observation, not an indication of how § 41.002(c) would apply to the facts in that case. The court never ruled on whether the Fannin County Sheriff's protection would have satisfied the statutory test.

reserve municipal police officers who hold a permanent peace officer license issued under Chapter 1701, Occupations Code," art. 2.12(2)); Tex. Ins. Code § 542.131(b) (giving both municipal police chiefs and sheriffs the authority to request information from insurance companies for criminal investigations).

On the other hand, at least one statute regards sheriffs as being a type of police officer. Tex. Gov. Code § 411.009(b) ("The director [of the Department of Public Safety] may require a sheriff or other police officer in a county or municipality, within the limits of the officer's jurisdiction, to aid or assist in the performance of a duty imposed by this chapter. The officer shall comply with the order to the extent requested.").  However, even Tex. Gov. Code § 411.009(b) implicitly associates sheriffs with counties and police officers with municipalities.

The most relevant Texas statute—dealing with a similar distinction between areas that are regarded as part of a municipality and those that are not—clearly denotes "police protection" as a municipal service.  Under Tex. Loc. Gov. Code § 41.003, an area may be considered part of a municipality if it has long been treated as part of a municipality.  Among the requirements for including an area in a municipality under § 41.003 is that "the municipality has provided municipal services, including police protection, to the area and has otherwise treated the area as a part of the municipality during the preceding 20 years."  Tex. Loc. Gov. Code § 41.003(b)(2).

None of these statutes decisively defines the term *police* as referring only to a municipal peace officer, as distinguished from a county sheriff.  The association of "police officer" with municipalities in certain statutes could be read as limiting the application of those statutes to municipal police officers, to the exclusion of other types of peace officers.  However, the statutes (i) consistently associate the term *police* with municipalities, rarely using the term to apply to any other type of peace officer besides a municipal police officer, and (ii) consistently use

different terms for municipal police and sheriffs.  These two factors weigh towards interpreting *police* in Tex. Prop. Code § 41.002(c) as referring only to municipally provided law enforcement services.

The implication of other Texas statutes clarifies the ambiguity in Tex. Prop. Code § 41.002(c):  the phrase "provided by a municipality or under contract to a municipality" modifies not only "at least three of the following services" but also "police protection" and "paid or volunteer fire protection."  The Hidalgo County Sheriff's services are not provided by a municipality, and therefore the Sheriff does not constitute police services for the purposes of § 41.002(c).  The Ramirez Homestead, at the time of the transfer, was a rural homestead.[7]

The Ramirezes transferred the homestead with the intent to hinder, delay, or defraud their creditors—specifically, the Rodriguezes.  However, because the contiguous portion of the real estate was their rural homestead, the transfer was not fraudulent under TUFTA.  Exempt or potentially exempt property is excluded from the definition of "asset" for the purposes of TUFTA, and the transfer of the Ramirez Homestead cannot be avoided despite the Ramirezes' intent.

### D.  Noncontiguous Property

The transfer of the Noncontiguous Property, however, was fraudulent.  The Noncontiguous Property is located thirty miles away from the other tracts, and it was not part of the Ramirez homestead.  Texas homestead law distinguishes between property that the debtor resides upon and noncontiguous, separated property.  *Norra v. Harris Cnty. (In re Norra)*, 421

---

[7] The Court's finding that the Ramirez Homestead was an exempt homestead at the time of the transfer should not be construed as a finding that the property is currently an exempt homestead.  Because the transfer is not avoided, Leonardo Ramirez, Jr., Anita Garza, and Feliberto Ramirez retain title to the property.  The Court does not consider whether any of the Ramirez children could claim the property as exempt.  Additionally, the Court does not hold that the children's interest in the now-transferred former homestead is exempt from execution in satisfaction of the judgment now rendered by the Court.

B.R. 782, 790 (Bankr. S.D. Tex. 2009).  "A debtor faces fewer legal obstacles when the debtor claims only land connected to the debtor's residence as the debtor's homestead."  *Id.*  "A separate parcel has been held to be part of the homestead where proof has been provided indicating that the land had been used as a site for a garage, stable, barn, horse lot, pasture, garden, or playground for the children of the family. . . . Separate land that is devoted primarily to generating income for the family, however, is not used principally for home purposes and thus is not included in the rural homestead."  *Perry v. Dearing (In re Perry)*, 345 F.3d 303, 318 n.22 (5th Cir. 2003) (citing *Walker v. Dailey*, 290 S.W. 813 (Tex. Civ. App.—Austin 1927)).

The Noncontiguous Property was used primarily for generating income, not for home purposes.  Feliberto Ramirez testified that the property was used for raising cattle or was leased and used to supplement the Ramirez's income.  Leasing the property is an economic use that generates income for the family, not a home purpose under *Perry*.

Although use of the land for raising cattle could be a "home purpose," the property also must be associated with the homestead tract.  *See In re Palmer*, 391 B.R. 386, 390 (Bankr. E.D. Tex. 2008) ("[A] claimant must demonstrate distinct evidence that the noncontiguous piece of property is associated with the resident tract and that it is more than a separate plot of land.") (quoting *PaineWebber Inc. v. Murray (In re Murray)*, 260 B.R. 815, 830 (E.D. Tex. 2001)).  There is no evidence that any cattle operation on the Noncontiguous Tract was associated with the farming on the Ramirez Homestead.  Absent a nexus with the Ramirez Homestead, the cattle operation was for an economic purpose rather than a home purpose.

The Ramirezes did not meet their burden of showing that the Noncontiguous Tract was part of their homestead.  The transfer of the Noncontiguous Property was fraudulent if it was

done with the intent to hinder, delay, and defraud the creditors, or if the elements of constructive fraudulent transfer are established.

The Court therefore considers whether the "badges of fraud" indicate that the transfer was made with the intent to hinder, delay, or defraud the creditors. The transfer of the real estate was to the Ramirez's children, who are insiders. The Ramirezes transferred the real estate because they expected to be sued by the Rodriguezes. The Ramirezes also received no consideration for the transfer. Moreover, although some of the transferred real estate was exempt, the two Gift Warranty Deeds transferred substantially all of the Ramirezes' real property, and the later transfers of the bank accounts completed the transfer of most of their assets. The badges of fraud, particularly the identity of the transferees, demonstrate intent to hinder, delay, and defraud the Ramirezes' creditors. The transfer was thus an actual fraudulent transfer.

The transfer also occurred after the shooting, when the Ramirezes were insolvent, and without reasonably equivalent value. The transfer of the Noncontiguous Property was also a constructive fraudulent transfer.

The Noncontiguous Property was not part of the homestead, and the transfer of those tracts was both actually and constructively fraudulent. Anita Garza and Feliberto Ramirez conspired with their parents to transfer the real estate, and they aided and abetted in the transfer. No evidence establishes the value of the transferred real estate. The Court vests title in the Noncontiguous Property with the Trustee.

### III. Bank Accounts

After the shooting, the Ramirezes transferred the money in their accounts at the La Joya Area Federal Credit Union[8] and Texas State Bank[9] to Leonardo Jr. and Feliberto Ramirez.  On December 28, 2009, the Court granted partial summary judgment, ruling that the transfers from the La Joya Area Federal Credit Union accounts were fraudulent.  (Doc. No. 97.)  At trial, the Court heard testimony and arguments as to whether the transfers from the Texas State Bank accounts were fraudulent.

The Ramirezes asserted at trial that Anita Ramirez had always held the funds in trust for her children, and that the children's names had appeared on the accounts at Texas State Bank from the time the accounts were established.  Because the funds were held in trust for the children, the Ramirezes argued, the transfers were not fraudulent.

Anita Ramirez had control of the accounts up until the time the funds were transferred in 2006.  The account at Texas State Bank was styled "Anita Ramirez, in trust for her children." Testimony established that the designation "ITF" on the account names meant "in trust for." Anita personally received the interest on the accounts.

Connie Hensley, a former employee of Texas State Bank, testified that when a customer sets up an account and designates that the account is "in trust for" some other party, the customer would still be free to transfer the funds to another account.  Gracie Flores, another former employee of Texas State Bank, noted that the bank would style accounts as the customer

---

[8] On March 13, 2006, the Ramirezes transferred $100,477.08 from certificate of deposit No. 0009715 to Leonardo Jr. and Billie Jo Ramirez's savings account.  On the same day, they transferred $50,025.42 from certificate of deposit No. 0009716 to Leonardo Jr. and Billie Jo's savings account.

[9] The Ramirezes transferred the funds in three certificates of deposit to Feliberto.  The certificates of deposit were No. 3589047, No. 2858058, and No. 2858049.  Each account held $100,000.00.  The accounts were closed on February 24, 2006.  No. 3589047 was transferred to Feliberto's No. 3624282, No. 28580578 was transferred to Feliberto's No. 3624246, and No. 2858049 was transferred to Feliberto's No. 3624255.

requested, but the customer who set up the account would execute all documents and retain control over the account. Anita Ramirez was thus free at any time to close the accounts without the consent of her children and to establish new accounts without the designation "in trust for."

The designation "in trust for" on the bank's records did not affect Anita's control over the accounts. When one person opens a savings account "in trust for" another without presenting evidence of an enforceable trust agreement, only the person claiming to be the trustee may withdraw funds from the account. Tex. Fin. Code § 65.106; *Bank of Am. v. Haag*, 37 S.W.3d 55, 59 (Tex. App.—San Antonio 2001). Anita Ramirez did not present evidence of an enforceable trust agreement to the banks, and the Court finds that no such trust agreement existed. Anita Ramirez retained control over the accounts.

The accounts were not a legal trust for the Ramirez Children. A trust may be created by declaration, by an inter vivos transfer of property to a trustee, by a testamentary transfer, by appointment of a trustee, or by a promise to another person whose rights are to be held in trust for a third person. Tex. Prop. Code § 112.001. Where the property owner retains control over the property, but holds it for beneficiaries, the trust must be created by declaration. Tex. Prop. Code § 112.001. Anita retained control over the accounts, so a trust existed here only if it was created by declaration. To be enforceable, the declaration establishing the trust must be in writing.[10] Tex. Prop. Code § 112.004.

There is no evidence that Anita executed any kind of written declaration of trust. The mere designation "in trust for" on the account name does not establish a trust where the

---

[10] Section 112.004, the statute of frauds applicable to trusts, allows trusts to be created without a written declaration where the trust property is transferred to a trustee who is neither the settlor nor the beneficiary. Anita, the purported settlor of the trust, retained control over the accounts, and therefore any trust must have been established by a written declaration.

purported settlor of the trust retains the ability to close the account for any reason.  If there was no trust, Anita was under no legal obligation to preserve or give the funds to her children.  The bank accounts remained her property until she actually transferred them to her children.

The transfers were therefore fraudulent if they were made without reasonably equivalent value or with the intent to hinder, delay, and defraud the creditors.  The transfers were without reasonably equivalent value and were thus constructively fraudulent.

The transfers were also actually fraudulent.  The badges of fraud were present in the transfer of the accounts.  The transfers were to insiders, occurred when the Ramirezes knew the Rodriguezes might obtain a substantial judgment against them, and completed the transfer of most of the Ramirezes' assets.  The Court finds that the transfers of the Texas State Bank accounts were made with the intent to hinder, delay, and defraud.  The transfers were therefore fraudulent under TUFTA.

Anita Garza and Feliberto Ramirez conspired to transfer both the La Joya and the Texas State Bank accounts and they aided and abetted in the transfers of the funds.  The Ramirezes, Anita Garza, and Feliberto Ramirez are jointly and severally liable for $450,502.50, the amount of the transferred funds.

Furthermore, because Feliberto and Alicia used $85,000.00 of the funds to pay off their mortgage, the Trustee is equitably subrogated to the lien on their home.  Equitable subrogation applies when "one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Ysasaga v. Nationwide Mut. Ins. Co.*, 279 S.W.3d 858, 865 (Tex. App.—Dallas 2009, no pet.).  The money Feliberto and Alicia used to pay their mortgage rightly belonged to the Ramirezes' bankruptcy estate.  The

estate therefore involuntarily paid a debt for which Feliberto and Alicia were primarily liable and should have paid. The estate is entitled to equitable subrogation on the lien.

### IV. Personal Property

Leonardo and Anita sold personal property after the shooting, including livestock and farm equipment. The personal property included horses, a saddle, cattle, goats, firearms, vehicles, cash, and farm and ranch equipment. The personal property, other than the bank accounts discussed above, was not fraudulently transferred.

Feliberto testified that the livestock and equipment had been sold to pay for legal expenses. No evidence established that the Ramirezes did not receive reasonably equivalent value for the personal property. The evidence was also insufficient to show that the Ramirezes sold the property with the intent to hinder, delay, or defraud any creditor of the debtor.

The Ramirezes had been threatened with suit at the time of the sales, and Anita Ramirez failed to disclose all the sales of personal property in her bankruptcy case. However, the personal property was not transferred to an insider, the Ramirezes did not retain control over the personal property, and testimony indicated that the Ramirezes received fair market value for the property. Moreover, Feliberto testified that the Ramirezes had used the proceeds to pay for their legal expenses, and this testimony was not rebutted. The Trustee did not establish that any personal property had been fraudulently transferred, and he therefore cannot recover for the bankruptcy estate any value from the sale of the personal property.

### V. Feliberto and Alicia's Transfer to Feliberto, Jr.

On November 4, 2008, Feliberto and Alicia Ramirez transferred a parcel of land in Fort Bend County to their son, Feliberto Ramirez, Jr. Feliberto and Alicia Ramirez's transfer of land to Feliberto, Jr. was pursuant to a preexisting contract. In exchange for Feliberto, Jr.'s

maintenance of the property over a period of several years, his parents transferred the land to him.

The transfer was made for reasonably equivalent value, and no evidence showed that Feliberto and Alicia intended to hinder, delay, or defraud creditors. Feliberto and Alicia entered into the land-maintenance contract in November 2003. They could not have anticipated being sued for the 2005 and 2006 transfers at that time. Therefore, Feliberto and Alicia could not have entered into the contract with the intent to hinder, delay, or defraud any creditor with respect to the debt created by the 2005 and 2006 transfers. The Trustee does not allege that the transfer was made with the intent to hinder, delay, or defraud any other creditor. The transfer was not fraudulent, and the Trustee may not recover the property transferred to Feliberto, Jr.

## VI. Joint and Several Liability

At the time of each of the transfers, Feliberto Ramirez and Anita Garza were aware that the Rodriguezes were likely to receive a substantial judgment as a result of the shooting. With respect to the transfer of the Noncontiguous Property and the Ramirezes' bank accounts, they were aware of and shared their parents' fraudulent intent. Both Feliberto Ramirez and Anita Garza conspired with the Ramirezes to transfer the funds. The Ramirezes, Feliberto Ramirez, and Anita Garza are therefore jointly and severally liable for the damages. *See Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 27-28 (Tex. App.—Tyler 2000) (holding defendants jointly and severally liable for damages caused by fraudulent transfer where a jury found that the transferees had "acquired the property transferred by Chappell with either actual or constructive notice of Chappell's fraudulent intent toward Plaintiffs").

21 / 29

## VII. Exemplary Damages

To recover exemplary damages under the Texas Civil Practice and Remedies Code, the Trustee must show by clear and convincing evidence that the defendants acted with fraud, malice, or gross negligence.  Tex. Civ. Prac. & Rem. Code § 41.003.  Here, the Trustee has proven by clear and convincing evidence that the defendants acted fraudulently and with malice. *See Lundy v. Masson*, 260 S.W.2d 482, 496 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("For a finding of malice to be sustained on appeal, legally sufficient evidence must show both that the act was likely to result in serious harm and that the defendant was consciously indifferent to the risk of harm."); *Foley v. Parlier*, 68 S.W.3d 870, 881 (Tex. App.—Fort Worth 2002, no pet.) (sustaining an exemplary damages award for fraud where the defendant provided false contract information and misconstrued monthly income check information).

At the time that the Ramirezes, Anita Garza, and Feliberto Ramirez conspired to transfer the real estate and the cash, they had objective substantial certainty that depriving the Rodriguezes of the judgment would result in serious harm to the Rodriguezes.  They transferred the real estate and cash with conscious indifference to the likelihood of harm.  The Ramirezes, Anita Garza, and Feliberto Ramirez also intentionally defrauded the Rodriguezes.  Their fraud and malice in bringing about the transfer warrant exemplary damages.

Although Roberto Rodriguez worked as a farm laborer and tractor driver, he was able to purchase a modest home.  At the time of the shooting, Rodriguez had paid off the mortgage on his modest home.  The family had no debt.  Nevertheless, their frugality was insufficient to allow the Rodriguezes to cope with the financial aftermath of the shooting.  Medical expenses were overwhelming, and the family lost the benefits of the regular income that Rodriguez brought into the household.

The harm the Rodriguezes suffered because of the fraudulent transfers was severe and foreseeable.  Because the Rodriguezes did not receive the money to which they were entitled, they were forced to take out a loan to pay their property taxes.  The loan was secured by a lien on the Rodriguez home.  When the Rodriguez family was unable to collect on their judgment on account of the fraudulent transfers, they were unable to repay the property tax loan.  The property tax lender foreclosed on the house.  But for the fraudulent transfers, the Rodriguezes would not have lost their home.

After the Rodriguezes lost their house, the family moved around, living in apartments and with Mrs. Rodriguez's mother.  At the time of the trial, Maria Rodriguez lived in Brownsville, Texas, away from her mother, father, and brother.

Because Patricia, Jose, and Maria do not have the money to take care of Roberto at home, Roberto now lives in a nursing home.  After Roberto got out of the hospital, his family was initially able to take care of him in their home on a daily basis.  His wife took care of his basic needs, and he was able to communicate with his wife, daughter, and son on a daily basis.  Roberto is now unable to see his family very frequently, because each person has to work to support the family.

The separation of the family is caused directly by their inability to collect on the judgment against the Ramirezes.  If the Rodriguezes had collected on the part of the judgment that could have been satisfied from the fraudulent transfers, they would not have lost their home.  The Ramirezes argued at trial that, because Medicare had paid for Roberto's nursing home treatment, Medicare would have had a lien on the family home.  The Rodriguezes, they argue, would have lost their home regardless of the transfers.

However, the judgment awarded damages to each member of the Rodriguez family. Medicare would have been unable to collect on any money awarded to Patricia, Maria, and Jose, so the family would have been financially better off if they had received the money. The Court finds that the Rodriguezes would have been able to keep their house if they had received the money from the Ramirezes, and that the family would not have been separated.

The separation has been intensely painful for each member of the family. Roberto testified that he suffers depression because he is unable to see his family members. Patricia testified that she felt daily emotional distress at not having her husband at home and being unable to take care of him. Jose and Maria testified that they missed having their father in their lives on a daily basis. Maria missed having her father's advice, and Jose felt great frustration and distress at being unable to support his family. All of the Rodriguezes testified that the emotional distress of the separation causes them to cry and feel depression on a daily basis.

Roberto also cannot pay for services that would improve his quality of life. He cannot afford physical therapy anymore. When Roberto was able to obtain therapy, his pain was alleviated and he was able to sleep better. Now he and his family are unable to pay for physical therapy or other treatments. Their inability to collect on the judgment against the Ramirezes has thus resulted in significantly greater physical pain for Roberto.

The Court finds the testimony by each of the members of the Rodriguez family to be wholly credible. They have suffered mightily—not just from Roberto's initial injuries that left him quadriplegic—but separately, and severely, for the separation caused by the fraudulent transfers.

The damages the Rodriguezes have suffered are severe, and the Ramirezes, Anita Garza, and Feliberto Ramirez knew or should have known that depriving them of the judgment money

would result in these or similar consequences.  Because Roberto had worked for the Ramirezes, the Ramirezes, Anita Garza, and Feliberto Ramirez were aware of his financial condition.  They knew that without the judgment money, Roberto would be unable to pay the expenses associated with the injury.  The Ramirezes, Anita Garza, and Feliberto Ramirez had objective substantial certainty that failure to pay Roberto would inhibit his ability to obtain medical care.  The transfer of the funds did inhibit Roberto's ability to obtain care, and his suffering is greater than it would otherwise been.

The Ramirezes, Anita Garza, and Feliberto Ramirez also had objective substantial certainty that if the family did not have the support they would have had from Roberto's earnings and should have received from the judgment money, the family would face economic difficulty.  The loss of the house was an objectively foreseeable consequence.  Furthermore, the separation of the family, caused by the economic difficulty, was an objectively foreseeable consequence.  The evidence is overwhelming and clear.  The Ramirezes, Anita Garza, and Feliberto Ramirez transferred the property and cash despite these foreseeable consequences, and the Court finds that they acted with malice.

The Court awards exemplary damages in the amount of $2.2 million.[11]  The Rodriguezes have a claim for exemplary damages against the estate, and the Court here establishes the value

---

[11] This amount is approximately three times the actual damages plus the legal fees.  Exemplary damages must be reasonably proportioned to actual damages.  *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981).  The determination of proportionality is made on a case-by-case basis.  *Id.*  Here, the trebling of actual damages is appropriate in light of the significantly greater physical pain suffered by Roberto Rodriguez, the severe emotional suffering sustained by the entire Rodriguez family, the objective likelihood that the family would suffer these harms, the relative financial situations of the Ramirezes and the Rodriguezes, and the extent to which the Ramirezes, Anita Garza, and Feliberto Ramirez's conduct offends a public sense of justice by preventing collection on a state-court judgment.  *See id.* (listing relevant factors in determining whether an exemplary damages award is reasonable:  the nature of the wrong, the character of the conduct of the wrong, the degree of the wrongdoer's culpability, the situation and sensibilities of the parties concerned, and the extent to which the conduct offends a public sense of justice and propriety); *see also Foley*, 68 S.W.3d at 881 (sustaining an exemplary damages award of 3.6 times actual damages where the defendant intentionally provided false contract information).

of that claim at $2.2 million.  The defendants are jointly and severally liable to the estate for causing the estate to incur the exemplary damages claim.

The Court finds that Anita Ramirez led the conspiracy to transfer the real estate and bank accounts, and her actions were motivated by malice.  She is jointly liable for the entire $2.2 million.  Anita Garza is also jointly liable to the estate for the entire $2.2 million.  Anita Garza repeatedly lied to the Court, and the evidence clearly and convincingly shows that she was motivated by malice when she participated in the transfers.  Unlike Anita Ramirez and Anita Garza, Feliberto Ramirez testified truthfully before the Court.  Feliberto's truthfulness at trial demonstrates that his malice in participating in the transfers was less than that of his family members.  The Court therefore mitigates Feliberto's damages, and he is jointly liable for only $1.1 million.  For the purposes of crediting Leonardo Jr. and Billie Jo's settlement amounts, the Court finds that that they would have been jointly and severally liable to the same extent as similarly situated relatives.

## VIII. Legal Fees

The Court is authorized under Tex. Bus. & Com. Code § 24.013 to award "costs and reasonable attorney's fees as are equitable and just."  The Court awards legal fees for Demetrio Duarte's services in the amount of $145,947.56 and for Michael Schmidt's services in the amount of $105,190.37.  Duarte and Schmidt testified as to the amount of time required by the case, their legal knowledge and experience, and the expenses incurred.  They also submitted time sheets and expense reports.  (Pl's Exs. 41 and 43.)  The Court finds that the time spent and the expenses incurred were reasonable in light of the complexity of the case and the results obtained. Leonardo Ramirez, Sr., Anita Ramirez, Feliberto Ramirez, and Anita Garza are jointly and severally liable for these amounts.

### IX. Effect of Settlement Agreements

Billie Jo Ramirez and Leonardo Ramirez, Jr., formerly defendants, entered into settlement agreements before trial.  Billie Jo Ramirez agreed to pay the Trustee $200,000.00, secured by a deed of trust for 85 acres owned by Billie Jo.  This amount settled not only Billie Jo's liability for the transfers from the Ramirezes, but also any potential liability arising out of a partition agreement she entered into with Leonardo Jr.  The Trustee agreed to stipulate that Billie Jo and Leonardo Jr.'s partition agreement was valid.

Leonardo Jr. agreed that a $150,000.00 judgment would be granted in the Trustee's favor. Leonardo Jr. also agreed that he would execute a special warranty deed vesting his one-third interest in the Ramirez Property in the Trustee.  Leonardo Jr.'s settlement agreement provided that if the Court did not avoid the transfers to the other defendants of the Ramirez Property, he would retain a one-third interest in the 5-acre square surrounding the Ramirez residence.  If the Court avoided the transfers to the other defendants, Leonardo Jr. would receive full title to a 10-acre square around the residence.  Both Billie Jo Ramirez's $200,000.00 payment and Leonardo Jr.'s $150,000.00 agreed judgment are credited against the total judgment.

### CONCLUSION

As announced at trial, the Court grants judgment in favor of the defendants on the common-law fraud and conspiracy to commit common-law fraud claims.  The Court also rules that Feliberto and Alicia Ramirez's transfer of real estate to Feliberto Jr. was not fraudulent.

The transfers of the Noncontiguous Property and the Ramirezes' bank accounts were made with the intent to hinder, delay, and defraud, and without reasonably equivalent value at a time when the Ramirezes were insolvent.  These transfers were actually and constructively

fraudulent.  The defendants are jointly and severally liable for the $450,502.50 that was transferred, and the transfer of the Noncontiguous Property is avoided.

However, the Ramirez Homestead was exempt, and the transfer of the Ramirez Homestead was not fraudulent.  The transfer of the Ramirezes' personal property, other than the bank accounts, was made in exchange for reasonably equivalent value and without the intent to hinder, delay and defraud.  These transfers are not avoidable.

The Court awards exemplary damages in the amount of $2.2 million.  The damages against Feliberto Ramirez are mitigated, and Feliberto is jointly and severally liable for only $1.1 million in exemplary damages.  The defendants are jointly and severally liable for $251,137.93 in legal fees.

The total amount of damages, before crediting the settlement amounts, is $2,901,640.43, plus the value of the Noncontiguous Property.  After the settlement amounts are credited, the total cash damage award is $2,551,640.43.

Anita and Leonardo Ramirez are jointly and severally liable for the exemplary damages and the legal fees, an amount totaling $2,101,137.93.  Anita Garza is jointly and severally liable for the full $2,551,640.43, an amount that includes the $450,502.50 in transferred cash, $2.2 million in exemplary damages, and $251,137.93 in legal fees, less the $350,000.00 credit.  After the $350,000.00 credit, Feliberto Ramirez is jointly and severally liable for the $450,502.50 in transferred cash, $1.1 million in exemplary damages, and $251,137.93 in legal fees, for a total liability of $1,451,640.43.

Pursuant to his settlement agreement with the Trustee, Leonardo Ramirez, Jr. is liable for $150,000.00 and must execute a special warranty deed in favor of the Trustee vesting the Trustee with title to Leonardo Jr.'s one-third interest in both the Ramirez Homestead and the

Noncontiguous Property.   Anita Garza and Feliberto Ramirez's two-thirds interest in the Noncontiguous Property is also returned to the Ramirez bankruptcy estate, and full title to the Noncontiguous Property is therefore vested in the Trustee.

SIGNED **January 5, 2011.**

_____

Marvin Isgur

UNITED STATES BANKRUPTCY JUDGE